And our next case on tap is Seneca v. Homeaglow Inc, case number 24-887. Good morning. May it please the Court, Michelle Gearhart on behalf of Appellant Homeaglow Inc. This appeal concerns the enforceability of an arbitration agreement in the context of an online transaction, and specifically, the narrow threshold question of whether an agreement to arbitrate exists. Applying California contract formation law to online transactions, this Court has stated an agreement to arbitrate is formed where two conditions exist. First, the website provides reasonably conspicuous notice of the terms to which the consumer will be bound, and second, the consumer takes some action, such as clicking a button, that unambiguously manifests his or her assent to those terms. And in the context of an online transaction, the presentation of the terms, the way the terms are presented in the user interface helps determine the enforceability of an arbitration provision that's found in terms and conditions. Here, I guess my biggest question is how a consumer would know, looking at Homeaglow's website, that there is more than one set of terms and conditions at issue here, because there are terms and conditions that don't contain the arbitration provision, and then there are those that do, and I couldn't really see, looking, you know, at the video, how a consumer would know the difference between those sets. Well, I think there's information that's presented initially that summarizes what the key points of the, what I will call, deal is, that Your Honor is calling terms and conditions. It's not until the point where the consumer is redeeming their voucher and triggering the forever clean membership that the terms and conditions that a normal consumer would expect to see in an ongoing forward relationship are presented via hyperlinks. So, I think there are, in the beginning pages of the website, there are facts, there's information that's stated that explains the forever clean membership, explains that purchasing the voucher requires forever clean membership. I would not characterize those as being the types of terms and conditions that a consumer would expect that is ultimately presented when the consumer is redeeming their voucher. Well, Ms. Gearheart, you raise the point that I wanted to ask you about, because I do think those earlier pages indicate to a consumer that purchasing a voucher requires a membership, that they're kind of bundled up together. And so, the trouble I have with your arguments is why the membership enrollment would attach at the I accept button and not when one has purchased the voucher itself. To me, once you've gone through the steps of knowing that these things are bundled together and you hit the purchase button and it's processing payment, and then you get into a scheduling cleaning page, you've entered into a contract. And that contract includes paying for the voucher, but also you're getting this membership. And at that point, none of those additional terms and conditions have been presented to a user to know that what they purchased also involves a class waiver release or binding arbitration. So, to Judge Thomas's point, I don't see how this is clearly conspicuous at the point that someone hits the purchase button page, button. Well, I think we have to look at the overall context of the transaction. And the voucher entitles someone to deeply discounted rates, but the voucher doesn't have to be redeemed right away. So, if somebody wants to make sure that they receive the entitlement to the discounted hourly rates, they can purchase the voucher, then they can do nothing with it ultimately and nothing happens. They're not charged anything until they go to redeem the voucher and schedule their ongoing cleanings. Then why does it say processing payment after you've hit the purchase button? If they're not being charged anything, I don't think a person would, a reasonable consumer would think that they're not being charged something at that point. Well, I believe they're being charged for the voucher. Okay. So, but once you purchase the voucher, there's no limitation on how much time can pass before it needs to be redeemed. You can wait 30 days, you can wait 60 days, you can wait 90 days before you actually schedule your cleaning, which at that point, that triggers your six-month forever clean membership. But that's my question. Why? If two different times, they're in the terms and conditions and then also in this, I guess, review page, there are these disclaimers that the voucher comes with the membership and then you put in your credit card or payment information and you hit purchase and then the payment is processed and then you're scheduling the cleaning. Why would someone think that at the point of scheduling a cleaning, you're also going to agree to another set of terms and conditions that include arbitration? Let me ask you this, because you guys raised a 28-J letter about a recent decision and I noticed that that decision did not talk about this, but don't we look at what the district court's factual findings for clear error? And what do we make of that standard of review in looking at this? Because the district court found that there was already a payment made at the purchase end and then, I guess, a separate attempt to agree to something else at the I accept end. Why shouldn't we accord that clear error review to say that this is not reasonably conspicuous? The court's review is de novo and when we talk about the enforceability of arbitration provisions that are presented in the online context where it's based on a website, this court can review the website for itself and make the determination. It's a question of law, ultimately, whether the consumer agreed to be bound by the terms and conditions that were presented. So I don't think that the court is bound by the incorrect factual determination of the district court regarding the sign-up process. Our cases talk about how whether something is arbitrable is reviewed de novo, but the factual findings underlying those decisions are reviewed for clear error. And it seems that at least in the context of the district court finding that a payment had already been made and the type of agreement that's being presented and the visual inspection of it, aren't those factual findings that are subject to differential review? Well, I think in this instance, Your Honor, the factual findings are quite wrong because the district court concluded that purchasing the voucher is what triggered the forever claim membership. And that's not supported in the record. I believe it's page 140 of the record, the declaration of Aaron Chung, where he explains it's when you redeem the voucher and you schedule your first cleaning that you're then agreeing to the six-month forever claim membership. And that is where the terms and conditions are presented to the user. And that is where the user clicks the button stating by legally binding electronic signature, I agree to Home of Glow's terms and conditions. So it's not purchasing the voucher, it's redeeming it. This language that you mentioned, this voucher requires six-month forever claim membership that you can cancel at any time. If there's disclaimer language prior to the purchase that says it requires it, why is the district court clearly, I guess, encouraging the purchase and clear error that purchasing the voucher doesn't come with the incidental purchase of the membership itself at that point, not in the I accept stage? Well, I think it's error because it's not accurately reflected in the record. The record clarifies... But the record says this voucher requires a membership. In order to, ultimately, the voucher is entitling the user to deeply discounted hourly rates on cleanings. There's unlimited cleanings. So in order to be entitled to the discounted hourly rates, one needs to agree ultimately to the six-month forever claim membership. If somebody purchases the voucher... The voucher without the membership does nothing. Nothing. Correct. I cannot see how a consumer would know that. The statement says voucher requires a forever claim membership, which grants future cleanings at 50 percent off. Membership's charged at this price. It can be canceled at any time. I can't see what in there tells a consumer that they haven't already purchased that membership at that point. That essentially what they've purchased at this point is nothing at all. It doesn't seem to say that. I can't see that the district court erred in any way in its conclusion. I think that the... Well, the presentation of the terms and what the deal is, I think ultimately the purchase of the voucher entitles the consumer to a discounted cleaning, a deeply discounted initial first cleaning and then discounted hourly rates on all subsequent... But it doesn't. It's the purchase of a voucher and a membership that allows them these discounted cleanings, right? Because you said the voucher doesn't do anything standing alone. Right. So it entitles users to a discounted initial cleaning and subsequent... A discount on subsequent cleanings that, yes, it's conditioned on a six-month membership in the Forever Clean program. You can't buy a voucher without getting the membership, can you? Well, you can buy a voucher and then before scheduling your first cleaning, you can decide that, no, I don't want to utilize this service and you can return the voucher for a full refund. Which would also end your membership. Well, the membership doesn't get triggered until you redeem the voucher. So the court made a separate point that there's no consideration for this. I guess what you're arguing is a second contract. There's an initial contract of buying the voucher and then at the point of scheduling the cleaning, the user enters into a second contract for the membership and what is the user giving in consideration for that second contract? Forty-nine dollars per month. And the voucher is not... And so what is the voucher purchase? Because that second agreement doesn't have a user resubmit payment information or signal to them you're making a separate purchase. That's the point where they sign up for an account. They create a username. They provide all of their detailed information and designate how often they want their cleanings, how many hours, and they schedule them. They indicate what their preference is for, are you going to have weekly cleanings, are you going to have bi-weekly, bi-monthly, etc. So they're redeeming the voucher. That's the point where they're signing up for the Forever Clean membership. That's the point where the $49 per month fee is triggered. And then that's the point in the transaction where the terms and conditions are presented. And they're presented very conspicuously above the action button. And that's the forward-looking relationship that is being initiated at that time. Any other questions? No, thank you. Did you want to reserve your time? I'll reserve my time. Thank you. Thank you. Good morning. May it please the Court. Sean Markley on behalf of plaintiffs below and our respondents here on appeal. I'm going to jump in where it seemed like we spent most of the time here during counsel's argument, which is whether there are two distinct transactions that are made conspicuous to a consumer as they navigate this multi-step sign-up process. To us, the distro did not err, and in fact got it exactly right, that there is a singular transaction that ends on the checkout page when you're purchasing your $19 Get Clean voucher, which in our view, unbeknownst to the consumer, ties them to this Forever Clean membership for $49 a month. They are inherently tied together. The use of one triggers the other. Again, we're alleging, I think, entitlement to presumption at this stage. The consumer does not know that when they're checking out of the scheduling page. And I think in addition to the earlier presentation of the terms, the terms and conditions making clear that the two run together, there's a single transaction, the scheduling page should really end any further consideration of whether there's a clear, conspicuous secondary contract entered into at that stage. The scheduling page makes zero reference to Forever Clean. It makes zero reference to memberships of any kind, and it makes zero reference to a $49 charge being triggered at that point. The scheduling page actually tells you the exact opposite, which is that what you're signing up for is a three-hour cleaning, and the price listed on the page in big, bold letters, once in black, once in green, is that the cost is free. So at the scheduling stage, the consumer sees that they're basically getting what they already paid for, which is now a free three-hour cleaning. And if Homoglow wanted to bind them to some secondary contract, it needed to make that conspicuous on that scheduling page. So for example, the page should read, you know, schedule and start my six-month Forever Clean membership, which will be charged at $49. And it definitely shouldn't say on that page that what you're getting is free if they're going to turn around and charge your credit card $49 at that stage. So to us, the district court got that exactly right, and the court should affirm on those grounds. Well, Mr. Merkley, just to circle back to my question to your opposing counsel, the Chabola decision didn't get into standards of review and what do we do with the district court's findings versus conclusions of law? Do you, how, what do you think about whether we are supposed to accord some of these findings clear error review? Yeah, I think it's a little bit nuanced. So in general, if courts are interpreting whether there was conspicuousness on a series of web pages and the contents are relatively undisputed, the district court looks at the same video that you all looked at. In that case, I actually have to agree with the opposing counsel that that would be a de novo standard. I think the more recent Ninth Circuit case has said if you're just looking at the contents of a basic page and not making any, like, resolutions of disputed facts, that that would be a de novo review. Of course, if the district court... What cases, for example, would you point us to? I believe that's in Oberstein and Kiva, one of those two. Whereas if the court is, you know, weighing mixed evidence or trying to draw a conclusion based on a more disputed fact, it would be clear error. What about the fact that there was some disagreement about what type of notice was here, inquiry notice, whether it was a click wrap or sign-in wrap? And I took it the parties had disagreements over that and the district court said it's a little bit of a blend of the two. That would seem to me to then, under what you just described, to be a clear error basis of review. That's fair, Your Honor. Yeah, and I do think that the court weighed, you know, I guess competing interpretations of whether this, you know, the hyperlinked terms above a button is equivalent to kind of checking a box saying I agree with the terms and conditions or whether it's merely signing in. I think that the textual notice for what I agree means presents sort of a mixed setting. I do think the district court weighed that. What about the district court talking about how conspicuous the final box was before I could accept whether it was visually conspicuous enough or not? What, you know, is that, does that fall more under the de novo standard or is that more of a factual finding? It's a webpage that it wasn't, you know, we didn't present any other evidence. It's just the one webpage. So I think that would probably be a de novo review. I do think that their argument about what I agree means on that page, that they're getting a lot of mileage out of what I agree means. You're doing a lot of things on that page. You're selecting a cleaner right up at the top. You're submitting some contact information. There's a cancellation policies, rescheduling policies, various FAQs on that page. And then even for the text box that they've kind of honed in on here, when you read that it says you're agreeing to three different hyperlinked terms and conditions. That's dozens and dozens of pages that they're trying to get through one click. And then as the lower court pointed out, and even after the by clicking I agree, here are the hyperlinks you're agreeing to text. There's also another form of agreement that they're agreeing to receive email and text message correspondence from both Home Aglow and the cleaners. So when you have all of these things going on on a pretty busy and cluttered webpage, I don't think it's conspicuous as the lower court found to also link terms and conditions. But I take it you share the view that an agreement was entered into when you hit the purchase button in the checkout page. And at that point, we have not seen anything of the additional terms and conditions that involve binding arbitration or class action waiver. That's correct. In our view, under the auto renewal law, that is independently fatal. And this came up in the sellers case. The JustAnswers had submitted basically two theories for how they bound the user to their terms and conditions. The first was when you're signing up for your $5 trial. And then the second one was when you're actually going to review the answer that you had submitted. This comes in a separate webpage after you've already paid your $5. And that was actually a click wrap box. But they said that the fact that it came post-purchase, it was by definition not in visual proximity to the $5 trial offer. And so the same thing is true here. When you actually commit yourself to the $19 voucher and the recurring membership at the checkout page, and then several steps later at the scheduling phase, if they're trying to bind you to new terms and conditions, those are not in visual proximity to the offer. And that's at business special code 17602 sub A1 has that requirement for auto renewing memberships. So, the way that the entire website flows, it does contemplate the user redeeming the voucher, but there's multiple steps that are listed across the top of the page, whether it's the website on a computer or on a mobile app. And so it's contemplating that the person purchasing the voucher is going to continue with the online process of then redeeming the voucher for the discounted rates, signing up for the membership, and completing the registration process, creating an account, and scheduling their initial cleaning, designating the frequency of their subsequent cleanings, which is contemplated by a membership. So, the entire context of the transaction is that the consumer would be doing this in one sitting. And, again, it's at that point where the voucher is being redeemed that the terms and conditions are being presented. And I think the presentation is consistent with other Ninth Circuit cases that have concluded that they were conspicuous, and it was very clear that the user manifested their assent to those terms by clicking a button stating, I agree. Is there a, I was looking for it and I didn't see it, but is there a Ninth Circuit case that addresses this factual circumstance of a purchase and then another sort of indication to click an I accept button that adds these additional terms and conditions? Is there any case analogous to that, either in the Ninth Circuit or California? Well, I think there are cases where there are subsequent purchases. So, Oberstein versus Live Nation, Meijer, which I believe, I think it's Meijer versus Uber. And then the Blizzard case where there were subsequent purchases of loot boxes in a video game. Same thing with Kiba, that concerned authorized subsequent in-app purchases. So, I think in those cases, it contemplates there's continuing charges that are going to be made, and those are controlled by the terms and conditions that are presented initially. Okay. Thank you. Thank you. Thank you, counsel, for your argument. The matter will stand submitted and court is adjourned. All rise.
judges: SANCHEZ, THOMAS, Liburdi